## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>c/o Department of Justice<br>Criminal Division, Asset Forfeiture and<br>    Money Laundering Section<br>1400 New York Avenue, N.W., 10th Floor<br>Washington, D.C. 20530,<br><br>        **Plaintiff,**<br><br>        **v.**<br><br>**APPROXIMATELY £22 MILLION IN<br>BRITISH POUNDS REPRESENTING THE<br>VALUE OF 4,000,000 SHARES OF<br>COMMON STOCK IN CARACAL<br>ENERGY INC., FORMERLY GRIFFITHS<br>ENERGY INTERNATIONAL INC., ON<br>DEPOSIT AT THE ROYAL BANK OF<br>SCOTLAND IN LONDON, UNITED<br>KINGDOM IN ACCOUNT NUMBER<br>10008114, AT SORT CODE 16-08-82, AND<br>ALL ASSETS TRACEABLE THERETO,**<br><br>        **Defendants *In Rem.*** | Civil Case No. _____ |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

***COMES NOW***, Plaintiff United States of America, by and through its undersigned

counsel, to allege, upon information and belief, as follows:

### I.    INTRODUCTION

1.      This is a civil action *in rem* to forfeit £22 million in British pounds

(approximately $34 million at current exchange rates) that represent the value of 4,000,000

founders' shares in Griffiths Energy International Inc. ("Griffiths Energy"), and that are traceable

to, and involved in the laundering of, bribe payments made to Chadian diplomats when they

were stationed in this District.  The Defendant properties are subject to forfeiture pursuant to 18

U.S.C. § 981(a).  Section 981(a)(1)(A) authorizes the forfeiture of property "involved in"

violations of federal money laundering statutes, or any property traceable to such property.

Section 981(a)(1)(C) authorizes the forfeiture of property that constitutes or is derived from,

*inter alia*, proceeds of "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), or a

conspiracy to commit such an offense, or property traceable to such property.

2.      As alleged herein, Mahamoud Adam Bechir ("Bechir") was Chad's ambassador

to the United States and Canada from approximately 2004 to 2012.  In 2009, the founders of

Griffiths Energy, a Canadian company, agreed to pay Bechir and his associates $2 million in

U.S. currency and valuable company shares in exchange for Bechir exercising his official

influence over the award to the company of lucrative oil development rights in Chad.  Griffiths

Energy issued the shares in 2009, and eventually, in 2011, paid $2 million to a company

nominally owned by Bechir's wife.

3.      Specifically, upon the creation of Griffiths Energy, which later became Caracal

Energy Inc. ("Caracal Energy"), Bechir's wife, Nouracham Bechir Niam ("Niam"), was issued

1,600,000 company shares for a nominal fee paid from the United States.  At the direction of

Bechir and Niam, an additional 1,600,000 shares and 800,000 shares were awarded to Adoum

Hassan ("Hassan") and Ikram Mahamat Saleh ("Saleh"), respectively, also for nominal fees paid

from the United States.  Saleh is the wife of Youssouf Hamid Takane ("Takane"), who was

Chad's deputy chief of mission to the United States until recently.  Hassan is an associate of

Bechir and Niam.  After several failed attempts, Niam and Bechir succeeded in transferring

Hassan's 1,600,000 shares to Niam's name in 2014.  As a result, Niam then held 3,200,000

shares, while Saleh still held 800,000 shares in Caracal Energy.

4.    In July 2014, Caracal Energy was acquired by a multinational company and the shares held by Niam and Saleh were liquidated at a per share price of £5.50 in British pounds. The value of the 3,200,000 shares held by Niam is now approximately £17.6 million in British pounds, while the value of the 800,000 shares held by Saleh is now approximately £4.4 million in British pounds. The total value of these shares, approximately £22 million in British pounds, is subject to forfeiture as criminal proceeds of a foreign bribery offense, as property involved in U.S. money laundering offenses, or as property traceable to such property.

## II.    DEFENDANTS *IN REM*

5.    The Defendant properties consist of approximately £22 million in British pounds, representing the value of 4,000,000 shares of common stock in Caracal Energy Inc., formerly Griffiths Energy International Inc., on deposit at the Royal Bank of Scotland in London, United Kingdom in account number 10008114, at sort code 16-08-82, and all assets traceable thereto, and are more fully described as (and hereinafter referred to as collectively, the "Defendant Assets"):

a.    Approximately £8.8 million in British pounds representing the value of 1,600,000 shares of common stock in Caracal Energy Inc., formerly Griffiths Energy International Inc., issued in certificate number CS-8 in the name of Nourachim Bechir Niam, also known as Nouracham Bechir Niam, on deposit at the Royal Bank of Scotland in London, United Kingdom in account number 10008114, at sort code 16-08-82, and all assets traceable thereto, including any accrued interest (the "First Defendant Asset");

b.    Approximately £8.8 million in British pounds representing the value of 1,600,000 shares of common stock in Caracal Energy Inc., formerly Griffiths Energy International Inc., issued in certificate number CS-6 in the name of Adoum Hassan and now held in the name of Nouracham Bechir Niam, on deposit at the Royal Bank of Scotland in London, United Kingdom in account number 10008114, at sort code 16-08-82, and all assets traceable thereto, including any accrued interest (the "Second Defendant Asset"); and

c. Approximately £4.4 million in British pounds representing the value of 800,000 shares of common stock of Caracal Energy Inc., formerly Griffiths Energy International Inc., issued in certificate number CS-9 in the name of Ikram Mahamat Saleh on deposit at the Royal Bank of Scotland in London, United Kingdom in account number 10008114, at sort code 16-08-82, and all assets traceable thereto, including any accrued interest (the "Third Defendant Asset").

6.     On or about June 27, 2014, a U.S. Magistrate Judge for the District of Columbia found that there was probable cause to believe that funds defined above as the First Defendant Asset and the Second Defendant Asset were subject to forfeiture, and issued a warrant for their seizure.

7.     Pursuant to a formal request from the United States for mutual legal assistance based on the U.S. seizure warrant, on or about July 24, 2014, U.K. authorities sought and were granted a restraint against the funds consisting of the First Defendant Asset and the Second Defendant Asset.

8.     U.K. authorities initiated separate proceedings against the Third Defendant Asset, which was restrained pursuant to a U.K. property freezing order issued on or about July 29, 2014.

9.     Accordingly, the Defendant Assets are currently restrained in the United Kingdom.

## III.   JURISDICTION AND VENUE

10.     This Court has jurisdiction over this subject matter. *See* 28 U.S.C. §§ 1345 and 1355(a) and 18 U.S.C. § 981(a)(1).

11.     This Court has *in rem* jurisdiction over the named Defendant Assets. *See* 28 U.S.C. §§ 1345 and 1355(a).

12.     Venue for this action is proper in this District because acts or omissions giving

rise to the forfeiture occurred in the District of Columbia. *See* 28 U.S.C. § 1355(b)(1).  Venue is also proper in this District because the Defendant Assets are located abroad. *See* 28 U.S.C. § 1355(b)(2).

## IV.    FACTUAL ALLEGATIONS

13.    In or about 2004, Bechir was appointed the Republic of Chad's ambassador to the United States and Canada, among other countries.  Takane served as Bechir's deputy chief of mission, a post which he held until on or about December 31, 2014.

14.    The Embassy of Chad for the United States and Canada is located in Washington, D.C., and during Bechir's tenure as ambassador, Bechir, Takane, and their respective families resided in the D.C. metropolitan area.

15.    In 2008, Canadian financier Brad Griffiths ("Griffiths") and his business partner Naeem Tyab ("Tyab") contacted Bechir and the Embassy of Chad in Washington, D.C. to pursue their interest in acquiring the development rights to certain oil blocks in Chad.

16.    In or about 2009, upon information and belief, Griffiths and Tyab met with the Bechir and Niam at their residence in the D.C. metropolitan area, and offered $2 million in U.S. currency and an opportunity to buy shares in their new Canadian energy company, Griffiths Energy, in exchange for Bechir and Niam using Bechir's unlawful assistance in securing the development rights to oil blocks in Chad.

### A.  First and Second Agreements

17.    On or about August 30, 2009, Bechir signed an agreement under which his company, Ambassade du Tchad, LLC, would purportedly provide consulting services to Griffiths Energy (the "First Agreement").  Specifically, the First Agreement indicated that Griffiths Energy would pay Ambassade du Tchad, LLC a $2 million consulting fee, if Griffiths Energy secured the development rights to the Doseo and Borogop oil blocks in Chad.

18.     Ambassade du Tchad, LLC was a company established by Bechir in Maryland in or about 2007.  Bechir opened accounts in the name of Ambassade du Tchad, LLC and used these accounts to pay for his personal expenses, as well as embassy-related bills.

19.     About a month after entering into the agreement, on or about September 2, 2009, Griffiths Energy terminated the First Agreement after Griffiths Energy's legal counsel advised Tyab that it was unlawful for Griffiths Energy to directly or indirectly offer or provide an advantage to Bechir, a foreign government official.

20.     About a week after Griffiths Energy terminated the First Agreement, Bechir's wife, Niam, established a new company, Chad Oil Consultants, LLC, also known as Chad Oil Consulting LLC.  The company was registered on or about September 10, 2009, in Nevada, with Niam listed as its managing member.  It was later registered in Maryland on or about March 1, 2011.

21.     On or about September 15, 2009, Niam, on behalf of Chad Oil Consultants, LLC, signed a consulting agreement with Griffiths Energy (the "Second Agreement").  Except for the substitution of Chad Oil Consultants, LLC for Ambassade du Tchad, LLC, the Second Agreement was identical to the First Agreement that had been terminated approximately two weeks earlier.

22.     Upon information and belief, Niam created Chad Oil Consultants, LLC for the purpose of executing the unlawful agreement to obtain the $2 million payment from Griffiths Energy and for the purpose of concealing her husband's role in the unlawful agreement.

23.     On or about September 24, 2009, at the Ritz-Carlton Hotel in Washington, D.C., Bechir, Takane, and other Chadian officials met with Griffiths and Tyab to discuss signing a memorandum of understanding with the Ministry of Petroleum and Energy of Chad.

**B.  Issuance of Company Shares to Bechir and Takane's Wives and Associate**

24.     In addition to entering into the Second Agreement, Griffiths Energy also agreed to grant a total of 4,000,000 founders' shares in order to obtain the unlawful assistance of Bechir in securing the development rights to oil blocks in Chad.

25.     Upon information and belief, Bechir recruited Takane, the first counselor of the Embassy of Chad (also known as the deputy chief of mission), to use his official position to assist Bechir in illegally influencing the assignment of oil development rights to Griffiths Energy in exchange for shares in Griffith Energy.

26.     Upon information and belief, instead of titling the 4,000,000 founders' shares in their own names, Bechir and Takane, along with representatives of Griffiths Energy, agreed to have Griffiths Energy issue the shares to their wives, Niam and Saleh, as well as to Hassan, an associate of Bechir and Niam.

27.     Pursuant to three separate subscription agreements, in or about October 2009, Niam, Hassan, and Saleh were awarded a substantial number of shares in Griffiths Energy at a per share price of .001 in Canadian dollars.  Niam was awarded a total of 1,600,000 common shares, Hassan was awarded an additional 1,600,000 shares, and Saleh was awarded 800,000 shares.

28.     To obtain these shares, on or about September 15, 2009, Niam, Saleh, and Bechir, signing as Hassan, each completed a U.S. accredited investor certificate in Washington, D.C., in which they falsely certified that each investor either had individual income in excess of $200,000 or joint household income in excess of $300,000 for each of the past two years.

29.     On or about September 19, 2009, Niam, Saleh, and Bechir obtained money orders from Western Union to pay for these shares.  Niam and Bechir, signing as Hassan, each obtained two money orders made payable to Griffiths Energy that totaled $1,488 in U.S. currency.  Saleh

obtained a money order made payable to Griffiths Energy for $745 in U.S. currency.  These

sums in U.S. currency were equivalent to the price of the shares in Canadian dollars.

30.    On her money orders and subscription agreement, Niam listed an address on

Foxhall Crescent, N.W. in Washington, D.C.  Based on property and financial records, this

residence was then owned by the Embassy of Chad, and Bechir had authority over the property

as ambassador.

31.    On his money orders and subscription agreement, Bechir, signing as Hassan,

listed as Hassan's address a residence on Harbour Town Drive in Silver Spring, Maryland.

Based on property and financial records, this residence was then owned by the Embassy of Chad,

and Bechir had authority over the property as ambassador.  In addition, this was the same address

that was listed for Ambassade du Tchad, LLC on the First Agreement with Griffiths Energy, as

well as on bank accounts held by Bechir, Niam, and Chad Oil Consultants, LLC.

32.    On or about September 24, 2009, Griffiths Energy accepted these subscription

agreements and payments.  On or about October 1, 2009, the directors of Griffiths Energy passed

a resolution that approved the direct placement of these and other founders' shares.

Consequently, 1,600,000 common shares of Griffiths Energy were issued to Niam in certificate

number CS-8, another 1,600,000 common shares were issued to Hassan in certificate number

CS-6, and 800,000 common shares were issued to Saleh in certificate number CS-9.  Niam's

shares were registered to Nourachim Bechir Niam, which misspells her name.  The proper

spelling of her first name is Nouracham.

33.    Aside from Niam, Hassan, and Saleh, there were only about six other founding

shareholders in Griffiths Energy, who held a total of approximately 36,000,000 shares in the

company.  Accordingly, Niam, Hassan, and Saleh collectively held approximately 10 percent of

8

the company's common shares at the time.

34.     Approximately one month after Niam, Hassan, and Saleh obtained this stake in Griffiths Energy, on or about October 26, 2009, the company entered into a memorandum of understanding with the Ministry of Petroleum and Energy of Chad to begin negotiations regarding the development of the Doseo and Borogop oil blocks in Chad.

### C.  Third Agreement and $2 Million Payment

35.     From about late 2009 through 2010, executives from Griffiths Energy and officials from the Government of Chad were engaged in negotiations over the development rights to the Doseo and Borogop oil blocks in Chad.  During this period, the Second Agreement expired and the $2 million fee was not paid.  In an e-mail sent on or about March 10, 2010, Takane, who had also agreed to use his position unlawfully to influence the assignment of oil development rights in Chad, encouraged Griffiths Energy executives to renew the company's agreement with Chad Oil Consultants, LLC in order to facilitate the conclusion of negotiations over the oil rights.  In addition, on or about December 13, 2010, Takane forwarded an e-mail from Bechir to Griffiths Energy representatives that also called for the renewal of the $2 million agreement.

36.     In or about January 2011, executives from Griffiths Energy provided the company's counsel, Macleod Dixon LLP, a copy of the terminated First Agreement with Ambassade du Tchad, LLC, and instructed the company's counsel to use the agreement as a model to draft a new consulting agreement with Chad Oil Consultants, LLC.  That same month, Niam, on behalf of Chad Oil Consultants, LLC, signed a revised consulting agreement that again promised payment of a $2 million consulting fee, if Griffiths Energy succeeded in securing development rights to the Doseo and Borogop oil blocks in Chad (the "Third Agreement").

37.     On or about January 19, 2011, Griffiths Energy (Chad) Ltd., a subsidiary of

Griffiths Energy, and the Ministry of Petroleum and Energy of Chad entered into a production sharing agreement for the exploration and development of the Doseo and Borogop oil blocks in Chad.

38.     A month later, on or about February 10, 2011, Macleod Dixon LLP followed wire instructions provided by Takane and transferred $2 million in U.S. currency to account number XXXXXXXXX1398 held in the name of Chad Oil Consultants, LLC at BB&T Bank in Washington, D.C. ("Chad Oil Account No. 1398").[1]

**D.  Attempted Transfers of Hassan's Shares**

39.     On or about April 14, 2011, Bechir purportedly obtained power of attorney over the Griffiths Energy shares registered to Hassan.

40.     On or about April 25, 2011, Bechir signed a document entitled "Stock Power" that attempted to assign and transfer Hassan's 1,600,000 common shares in Griffiths Energy to Nourmac LLC.  This document was signed in Washington, D.C. in the presence of a D.C. attorney and notary public.

41.     On the same day, on or about April 25, 2011, a cashier's check for $120,000 from account number XXXXXX9962 held by Nourmac LLC at Mainstreet Bank in Virginia was deposited into account number XXXXXX5303 held by Bechir at the same bank.  On the bottom corner of the check, a handwritten notation indicated that the $120,000 was for 1,600,000 shares in Griffiths Energy.  Upon information and belief, the cashier's check was an attempt by Bechir and Niam to further substantiate the transfer of Hassan's 1,600,000 shares to Nourmac LLC, which they controlled.

---

[1] Funds traceable to the $2 million bribe payment are the subject of a separate civil forfeiture action filed in the District. *See United States v. All Funds Up to and Including $1,474,517 in Interbank Accounts Held by or for the Benefit of Nedbank, Ltd.*, Civil Case No. 14-1178 (RJL).

42.     Like Chad Oil Consultants, LLC, Nourmac LLC was a company owned by Niam and registered in Maryland.  Although Nourmac LLC's Maryland registration only listed Niam as a managing member, financial records show that Bechir was a member of Nourmac LLC and that he also controlled and directed the use of the funds held in the company's bank accounts.

43.     Although they submitted the Stock Power to Griffiths Energy representatives, Bechir and Niam initially were unsuccessful in transferring Hassan's shares to Nourmac LLC.

44.     Around the same time, on or about April 19, 2011, Niam withdrew a cashier's check made payable to Takane's wife, Saleh, for $290,000 from account number XXXXXX1592 held by Chad Oil Consultants, LLC at Mainstreet Bank ("Chad Oil Account No. 1592").  The funds in Chad Oil Account No. 1592 were traceable to the $2 million bribe payment that had been deposited by Griffiths Energy into Chad Oil Account No. 1398.  The $290,000 cashier's check was never cashed, and was ultimately re-deposited into Chad Oil Account No. 1592.

45.     Niam had previously attempted to pay a similar amount to Takane and Saleh.  On or about February 15, 2011, she transferred $300,000 of the $2 million bribe payment deposited into Chad Oil Account No. 1398 to an account held by Takane at EagleBank.  EagleBank rejected the transfer, and the sum was returned to Chad Oil Account No. 1398.  On or about February 17, 2011, Niam successfully transferred $10,000 of the $2 million bribe payment to an account held by Takane at Bank of America.  The value of the April 2011 cashier's check made payable to Saleh, $290,000, is equal to the difference between the $300,000 that Niam initially attempted to transfer to Takane and the $10,000 he actually received.

46.     Between about May 2011 and about August 2011, in several e-mails, Niam and her counsel corresponded with Griffiths Energy employees in an effort to transfer the 1,600,000 common shares registered to Hassan to her name.

47.     On or about June 27, 2011, Hassan signed a stock purchase and sale agreement that purportedly transferred his 1,600,000 common shares in Griffiths Energy to Niam for $120,000. On the same date, Hassan signed a document entitled "Stock Power" that assigned and transferred Hassan's shares to Niam. These documents were signed in N'Djamena, Chad, in the presence of the Canadian consul or her representative.

48.     On or about September 2, 2011, Saleh, or someone purporting to be Saleh, requested that Griffiths Energy send her share certificate, representing 800,000 Griffiths Energy common shares, to her address in Silver Spring, Maryland, or deposit it into an account in Canada.

### E.  Conviction of Griffiths Energy and Transfer of Hassan's Shares

49.     On or about January 22, 2013, Griffiths Energy admitted in Canadian court that it had unlawfully agreed to provide a benefit to Bechir, and paid Bechir $2 million in U.S. currency and company shares in order to induce him, a foreign government official, to exercise his influence over the award to the company of oil development rights in Chad.

50.     On or about January 25, 2013, Griffiths Energy pleaded guilty in Canadian court to violating section 3(1)(b) of the Canadian Corruption of Foreign Public Officials Act. The Canadian court found that "the bribe involved the payment of $2 million to a corporate entity owned by the wife of the foreign ambassador as well as a number of founder[s'] shares," and imposed a fine of 10.35 million in Canadian dollars on Griffiths Energy.

51.     Griffiths Energy subsequently changed its name to Caracal Energy.

52.     On or about February 19, 2013, Canadian authorities issued a warrant to obtain share certificates CS-8 and CS-6 registered to Niam and Hassan, respectively, that represented a total of 3,200,000 common shares in Caracal Energy, formerly Griffiths Energy.

53.     On or about March 22, 2013, Canadian authorities issued a warrant to obtain

share certificate CS-9 registered to Saleh that represented 800,000 common shares.

54.    On or about April 16, 2014, upon the withdrawal of an application lodged by the Canadian prosecutors against the shares registered to Niam and Hassan, the Court of the Queen's Bench of Alberta ordered share certificates CS-8 and CS-6 be released and delivered to Niam's counsel.

55.    Also on or about April 16, 2014, upon the withdrawal of an application lodged by the Canadian prosecutors against the shares registered to Saleh, the Court of the Queen's Bench of Alberta ordered share certificate CS-9 be released and delivered to Saleh's counsel, noting that Canadian prosecutors had not presented evidence to support forfeiture of Saleh's shares and adjudging that the shares were lawfully acquired by her.

56.    On or about June 3, 2014, Niam requested that the Canadian court order Caracal Energy's stock transfer agent to transfer to her name the 1,600,000 common shares registered to Hassan, and to deliver the resulting 3,200,000 common shares in Caracal Energy to her counsel to be held in trust.

57.    On or about June 10, 2014, the Court of Queen's Bench of Alberta granted Niam's application to formally transfer to her name the 1,600,000 common shares registered to Hassan.  As a result of the Canadian court's order, 3,200,000 shares of common stock in Caracal Energy were then held by Niam.  Saleh still held 800,000 shares of common stock.

**F.  Acquisition of Caracal Energy**

58.    On or about April 14, 2014, a multinational company agreed to acquire Caracal Energy for a per share price of £5.50 in British pounds in cash.

59.    Accordingly, Niam's total 3,200,000 shares, which were originally purchased for approximately $3,000 in U.S. currency, are now valued at £17.6 million in British pounds, while Saleh's 800,000 shares, which were originally purchased for approximately $745 in U.S.

currency, are now valued at £4.4 million in British pounds. In total, these 4,000,000 shares are valued at £22 million in British pounds, which is approximately $34 million in U.S. currency at current exchange rates.

60.    To obtain the cash value of these shares under the terms of the acquisition agreement, Niam and Saleh, like other Caracal Energy shareholders in possession of physical certificates for common shares, surrendered their certificates to Caracal Energy's depository agent. At the time of the submission of the letters of transmittal, upon information and belief, Saleh and Takane resided in the United States.

61.    On or about July 8, 2014, when the acquisition agreement for Caracal Energy became effective, the funds to purchase these Caracal Energy shares were deposited into an account at the Royal Bank of Scotland in London, United Kingdom.

62.    Accordingly, the current value of the 3,200,000 shares held by Niam, which were previously issued in certificate numbers CS-8 and CS-6, and the 800,000 shares held by Saleh, which were previously issued in certificate number CS-9, was deposited into the Royal Bank of Scotland in London, United Kingdom. These funds are currently restrained in account number 10008114, at sort code 16-08-82.

## V.    BASIS FOR FORFEITURE

63.    Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. §§ 1956 and 1957], or any property traceable to such property" is subject to forfeiture to the United States.

64.    Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' . . . , or a conspiracy to commit such offense" is subject to forfeiture

to the United States.

65.     A "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(B)(iv),

(c)(7)(D) to include, among other things: (i) with respect to a financial transaction occurring, in

part, in the United States, a foreign offense involving bribery of a public official; and (ii) a

felony violation of the Foreign Corrupt Practices Act.

66.     Bribery of a public official is a criminal offense under Chadian law, including but

not limited to legal provisions set forth in article 14, Chapter 3, Title II of Chad Act No.

004/PR/2000 (prohibiting government officials from soliciting or receiving bribes in exchange

for exercising their influence).  This article of Chadian law, translated into English, is provided

in Attachment A.

67.     In addition, bribing a public official is a criminal offense under Canadian law,

including but not limited to legal provisions set forth in section 3(1)(b) of the Canadian

Corruption of Foreign Public Officials Act (prohibiting bribery of a public official).  This section

of Canadian law is provided in Attachment B.

68.     The Foreign Corrupt Practices Act imposes a criminal penalty on any person who:

> while in the territory of the United States, corruptly [makes] use of the
> mails or any means or instrumentality of interstate commerce or to do
> any other act in furtherance of an offer, payment, promise to pay, or
> authorization of the payment of any money, or offer, gift, promise to
> give, or authorization of the giving of anything of value to—
>
> (1) any foreign official for purposes of—
>
> > (A)(i) influencing any act or decision of such foreign official in his
> > official capacity,
> > (ii) inducing such foreign official to do or omit to do any act in
> > violation of the lawful duty of such official, or
> > (iii) securing any improper advantage; or

(B) inducing such foreign official to use his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality,

in order to assist such person in obtaining or retaining business for or with, or directing business to, any person[.]

15 U.S.C. § 78dd-3.

## FIRST CLAIM

### (18 U.S.C. § 981(a)(1)(C) for violations of foreign bribery offenses)

69.   The factual allegations in paragraphs 1-68 are re-alleged and incorporated by reference herein.

70.   As set forth above, the Defendant Assets constitute or are derived from proceeds traceable to foreign offenses involving bribery of a public official that occurred, in part, in the United States, or a conspiracy to commit such offenses.  The foreign offenses at issue are set forth in paragraphs 66 and 67, above.

71.   Accordingly, the Defendant Assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that they constitute or are derived from proceeds traceable to a violation of a specified unlawful activity, or a conspiracy to commit such an offense.

## SECOND CLAIM

### (18 U.S.C. § 981(a)(1)(C) for violations of the Foreign Corrupt Practices Act)

72.   The factual allegations in paragraphs 1-68 are re-alleged and incorporated by reference herein.

73.   As set forth above, the Defendant Assets constitute or are derived from proceeds traceable to a violation of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-3, or a conspiracy to commit such an offense.

16

74.     Accordingly, the Defendant Assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that they constitute or are derived from proceeds traceable to a violation of a specified unlawful activity, or a conspiracy to commit such an offense.

## THIRD CLAIM

**(18 U.S.C. § 981(a)(1)(A) for violations of 18 U.S.C. § 1956(h))**

75.     The factual allegations in paragraphs 1-68 are re-alleged and incorporated by reference herein.

76.     Title 18, United States Code, Section 1956(h) imposes a criminal penalty on any person who "conspires to commit any offense defined in [18 U.S.C. §§ 1956 or 1957]." 18 U.S.C. § 1956(h).

77.     Title 18, United States Code, Section 1956(a)(2)(A) imposes a criminal penalty on any person who:

> transports, transmits or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
>
> (A) with the intent to promote the carrying on of specified unlawful activity[.]

18 U.S.C. § 1956(a)(2)(A).

78.     As set forth above, the Defendant Assets were involved in a conspiracy to conduct, or attempt to conduct, transactions in violation of 18 U.S.C. § 1956(a)(2)(A), affecting interstate or foreign commerce, that involved the proceeds of specified unlawful activity, that is, conduct constituting a violation of (i) a foreign offense involving bribery of a public official and/or (ii) the Foreign Corrupt Practices Act.  The foreign offenses at issue are set forth in

paragraphs 66 and 67, above.

79.     Accordingly, the Defendant Assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that they constitute property involved in a money laundering conspiracy in violation of 18 U.S.C. § 1956(h), or are traceable to such property.

## FOURTH CLAIM

### (18 U.S.C. § 981(a)(1)(A) for violations of 18 U.S.C. § 1956(h))

80.     The factual allegations in paragraphs 1-68 are re-alleged and incorporated by reference herein.

81.     Title 18, United States Code, Section 1956(h) imposes a criminal penalty on any person who "conspires to commit any offense defined in [18 U.S.C. §§ 1956 or 1957]." 18 U.S.C. § 1956(h).

82.     Title 18, United States Code, Section 1956(a)(1)(B)(i) imposes a criminal penalty on any person who:

> knowing that the property involved in a financial transaction
> represents the proceeds of some form of unlawful activity, conducts or
> attempts to conduct such a financial transaction which in fact involves
> the proceeds of specified unlawful activity— . . .

(B) knowing that the transaction is designed in whole or in part—

> (i) to conceal or disguise the nature, the location, the source, the
> ownership, or the control of the proceeds of specified unlawful
> activity[.]

18 U.S.C. § 1956(a)(1)(B)(i).

83.     Title 18, United States Code, Section 1957 imposes a criminal penalty on any person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity."

18 U.S.C. § 1957(a).

84.     As set forth above, the Second Defendant Asset was involved in a conspiracy to conduct, or attempt to conduct, transactions in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and/or 1957, affecting interstate or foreign commerce, that involved the proceeds of specified unlawful activity, that is, conduct constituting a violation of (i) a foreign offense involving bribery of a public official and/or (ii) the Foreign Corrupt Practices Act.  The foreign offenses at issue are set forth in paragraphs 66 and 67, above.

85.     Accordingly, the Second Defendant Asset is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it constitutes property involved in a money laundering conspiracy in violation of 18 U.S.C. § 1956(h), or is traceable to such property.

**WHEREFORE**, Plaintiff, the United States of America, requests that this Honorable Court issue warrants for the arrest of the Defendant Assets; that notice of this action be provided to persons known or thought to have an interest in or right against the Defendant Assets; that the Defendant Assets be forfeited and condemned to the United States of America; and for such other and further relief as this Court may deem just, necessary and proper.

Respectfully submitted,

M. KENDALL DAY, CHIEF
ASSET FORFEITURE AND
    MONEY LAUNDERING SECTION

Dated:      June 30, 2015                    /s/ Nalina Sombuntham

DANIEL H. CLAMAN
Principal Assistant Deputy Chief
NALINA SOMBUNTHAM
Trial Attorney

STEVEN C. PARKER
Senior Trial Attorney
ASSET FORFEITURE AND
   MONEY LAUNDERING SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE
1400 New York Avenue, N.W., 10th Floor
Washington, D.C. 20530
Telephone:     (202) 514-1263
Fax:              (202) 514-5522
Attorneys for Plaintiff
UNITED STATES OF AMERICA

## VERIFICATION

I, Bridget Cox, hereby verify and declare under penalty of perjury that I am a Special Agent with the U.S. Federal Bureau of Investigation ("FBI"), that I have read the foregoing Verified Complaint for Forfeiture *In Rem* ("Verified Complaint") and know the contents thereof, and that matters contained in the Verified Complaint are true to my own knowledge, except that those herein stated to be alleged on information and belief and as to those matters I believe to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent of the FBI.

I hereby verify and declare under penalty of perjury that the foregoing factual allegations are true and correct to the best of my knowledge and belief.

Executed on this **29** day of June, 2015.

/s/ Bridget Cox
Bridget Cox
Special Agent
Federal Bureau of Investigation